In re Ann SIEGEL, Debtor.

DORET SHOPS, INC., Plaintiff,

v.

Ann SIEGEL, Defendant.

Bankruptcy No. 96–02018–8P7.
Adv. No. 96–562.

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

Feb. 12, 1997.

Charles L. Steinberg, Orlando, FL, for Plaintiff.

Jay D. Passer, Tampa, FL, for Defendant.

### FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OPINION

ALEXANDER L. PASKAY, Chief Judge.

THIS IS a Chapter 7 case and the matter under consideration is a challenge to the dischargeability of a debt owed by Ann Siegel (Debtor), the Defendant named in the Complaint filed by the Plaintiff, Doret Shops, Inc. (Doret Shops). The claim of nondischargeability is based on Sections 523(a)(4) and 523(a)(6) of the Bankruptcy Code.

According to Doret Shops, the Debtor was an officer and a director of Doret Shops and as such she owed a fiduciary duty to Doret Shops and she breached this duty. In the alternative, Doret Shops contends that the Debtor converted corporate assets to her own use. Based on the foregoing, Doret Shops contends that it is entitled to a judgment determining that the Debtor is indebted to Doret Shops in the amount of $397,-345.51, which debt should be excepted from the protection of the general bankruptcy discharge.

The facts relevant to the claims under consideration as developed at the final evidentiary hearing are as follows. The Plaintiff, Doret Shops, Inc. is a Florida corporation and was the owner of a retail gift shop operated under the fictitious trade name of "Regent Shops" located at the Tyrone Square Shopping Center in St. Petersburg, Florida. At the relevant time, Doret Shops had a merchandise inventory valued in the amount of $250,000.00 wholesale. In addition, it had other miscellaneous assets, furniture and fixtures, valued in the amount of $10,000.00.

The President and sole stockholder of Doret Shops was Mr. Jack Siegel (Mr. Siegel), the former husband of the Debtor. The Debtor was also an officer of Doret Shops although she was not a stockholder. All of the outstanding shares were held by Mr. Siegel. Malcom Siegel (Malcom), the son of the couple, was also an officer and possibly a director of Doret Shops. It is without dispute that he was actively involved in the day-to-day operation of the gift shop.

Harmony and cooperation are essential ingredients to the success of a family-owned business and the dissention and fights between family members involved in a business usually produce a very predictable results. In the present instance, Mr. Siegel and the Debtor became embroiled in a bitter dissolution of marriage proceeding which began in 1987 and concluded with the entry of a Final Judgment dissolving the marriage in 1989 (Plaintiff's Exh. 32). The Final Judgment, Paragraph 4 provided that the Debtor shall be awarded one-half of Mr. Siegel's interest in the stock of Doret Shops d/b/a Regency.

On June 4, 1972, Tyrone Square Inc. leased its premises to Doret Shops in the shopping center known as Tyrone Square Shopping Center in St. Petersburg (Plaintiff's Exh. 1). The lease which was signed by both Mr. and Mrs. Siegel, as President and Secretary respectively, leased the premises for fifteen (15) years commencing 120 days after the date the leasee opened for business. It is without dispute that the Debtor acted as a manager of the store and Malcom was also an employee of the corporation.

When the lease was about to expire, but prior to the closing of the store, there developed constant friction between the Debtor and Mr. Siegel due to the claimed overstocked status of the inventory. According to Mr. Siegel, this was the result of excessive

and unnecessary buying of inventory by the Debtor and Malcom. By the end of December of 1987, the store closed and this started a tug-of-war between the parties as to who had access to the store premises. The locks were changed some eight times, either by one or the other parties and the police were called twice. Before Mr. Siegel was able to secure and remove the merchandise from the store, he was involuntarily committed by the Debtor under the Baker Act as incompetent. In addition, Mr. Siegel was involved in a fight with his other son, Bobby, and was arrested and placed in jail for ninety days. According to a newspaper article in the St. Petersburg Times dated December 30, 1987 (Plaintiff's Exh. 15), Mr. Siegel was charged with aggravated battery and aggravated assault with a motor vehicle. The newspaper article further stated that Mr. Siegel attacked his son with a pair of brass knuckles. According to the police, Mr. Siegel was already under a restraining order directing him to keep away from the former marital home.

In 1987 after the store closed, Mr. Siegel suggested to Malcom that he visit Naples, Florida and find a suitable location to relocate the business. When Malcom reported that his trip was unsuccessful, Mr. Siegel and his son drove to Orlando for the purpose of negotiating a lease in the newly constructed small, up-scale shopping center known as "Church Street Station" (Church Street).

It appears that Mr. Siegel negotiated a lease which was prepared with Church Street Station Associated L.P. On its face, the lease indicated that the parties to the lease were Church Street Station and Doret Shops, Inc. a/k/a Regency (Plaintiff's Exh. 16). However, on the execution page of the document, the tenant is identified as Mallan, Inc., a Florida corporation. It is without dispute that Mallan, Inc. was the newly formed corporation formed by Malcom and his mother, Ann, the Debtor. It is also without dispute that the lease was signed by Malcom Siegel as President. It is clear from this record that it was Malcom's idea to form the corporation, although the Debtor was tacitly supporting the step taken by Malcom. Mr. Siegel was completely excluded from the ownership of or any other interest in this corporation.

The primary controversy centers around the disposition of the inventory which was originally at the Tyrone Square Mall. While who removed the inventory is hotly disputed, it is without dispute that Malcom Siegel leased storage space from Ark Self Storage in Largo Florida. This space was lot number C87 and consisted of a ten foot by forty foot space at the monthly charge of $93.45 (Plaintiff's Exh. 14). The owner on the lease is identified only by Siegel, but it was clearly signed by only Malcom Siegel. The Debtor was also named as another party who had access to the storage facility. While the Debtor denied that she even knew the existence of the name of the storage facility, this Court is constrained to reject the testimony and is satisfied that she was fully aware of the location of Ark Storage and that she was also fully aware that the inventory of Doret Shops was stored in the space rented by Malcom. In this connection, it should be noted that there is evidence in this record that the wholesale value of the inventory on hand at Doret Shops just prior to the closing was approximately $250,000.00.

It is uncontradicted that Malcom was observed removing the inventory from the storage and driving it to Orlando, Florida. It is also without serious dispute that the inventory of Doret Shops was placed in the new store at Church Street which was owned and operated by Mallan, Inc.

The Debtor contends, unsupported by any corroborating evidence, that the inventory of Doret Shops was removed and stored in the apartment of Mr. Siegel. The Debtor claimed to have visited Mr. Siegel's apartment when their son Robert died. At that time, the Debtor claims to have seen the inventory at Mr. Siegel's apartment. This Court is unwilling to accept this testimony as believable, especially in light of the fact that there is fully documented evidence that Malcom leased storage space from Ark Storage. Moreover, considering the monetary wholesale value $250,000.00, this inventory could not have possibly been placed in Mr. Siegel's small apartment.

While in Orlando, the former vendors of the merchandise assumed that they were still dealing with Doret Shops and the invoices fully support this fact. (Plaintiff's Exh. 21). The invoices were addressed to Doret Shops in Orlando, Florida. However, the evidence reflects that it is clear that Doret Shops never owned and operated a store in Orlando, Florida. The store in Orlando folded and Malcom Siegel relocated the business first in Brookesville, Florida, then at a different location in the same city and ultimately in Largo, Florida.

It further appears from the record that a new corporation was formed by Malcom and his mother, Ann, under the name of Annie's Collectibles, Inc. In Springhill, the Debtor operated this retail store for a short while. Although there is no evidence from this record, it is safe to assume that indeed some of the inventory of Annie's Collectables was in fact the same inventory from the Doret Store. Furthermore, Annie's Collectables had no additional funds to purchase an entire store worth of inventory and thus, some of the inventory in the new store was from the previous stores.

In due course, Mr. Siegel and Doret Shops, Inc. filed a suit in the Circuit Court of the 9th Judicial Circuit in and for Orange County, Florida against Mallan, Inc. d/b/a Regency and d/b/a Mallan, Malcom Siegel, Ann Siegel, and Annie's Collectables, Inc. On November 29, 1993, the Circuit Court in and for Orange County, Florida entered the Final Judgment Granting Accounting, authorizing Mr. Siegel to inspect the inventory of Annie's Collectibles, Inc. and also ordering the Debtor to file a full accounting. (Plaintiff's Exh. 26).

An Amended Final Judgment After Rehearing was granted on April 8, 1996. This Judgment determined that the value of the assets in dispute had a net value of $264,499.00; that both the Debtor and Malcom breached a fiduciary duty; that both transferred assets to Annie's Collectables, Inc.; and that Mallan, Inc. was conducting a business in Springhill, Florida known as "Classic Gifts." Based on the foregoing, the Court entered a Final Judgment in favor of Mr.

Siegel and against the Defendants in the total amount of $397,345.51.

The Debtor, who was quite economical with her memory, did not appear to remember anything. She denied any involvement in the removal and storing of the inventory. While she concedes she worked in the Orlando store, she claims to have no actual interest in Mallan, Inc., with the exception of being named as Secretary of the corporation.

The claim of nondischargeability is based on § 523(a)(4) of the Bankruptcy Code. The standard of proof required to prevail on a claim of nondischargeability is no longer the clear and convincing proof but merely a preponderance of the evidence standard. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). The evidence fully supports the proposition that the Debtor was in fact a corporate officer of Doret Shops, that she owed a fiduciary duty to Doret Shops, and that her conduct, albeit might not have been as active as the conduct of Malcom, was nevertheless tantamount to a breach of the duty. The Debtor, as a corporate officer, has a duty to assure that the corporate assets are not diverted and not to silently participate in the conversion of the assets of the corporation. Thus, this finding warrants the conclusion that the Debtor is guilty of defalcation while acting as a fiduciary. For the above reasons, this Court is satisfied that this evidence is more than sufficient to establish a claim of nondischargeability based on § 523(a)(4).

Concerning the claim based on § 523(a)(6) of the Bankruptcy Code, the claim of conversion is equally supported by the evidence. Although the tort of conversion is not expressly included in the language of § 523(a)(6), which excepts from the protection of the discharge, liability resulting from the willful and malicious injury to an entity, or property of an entity, it can no longer be gainsaid that the common law of conversion is included in the exception. The term conversion is defined as unauthorized assumption and exercise of the right of ownership of the goods and personal chattels belonging to another. BLACK'S LAW DICTIONARY 332 (6th Edition 1990).

While the prime mover in removing the assets of Doret Shops was Malcom, the Debtor was certainly a willful participant in everything that Malcom did. Moreover, she had access to the warehouse facility. Furthermore, she was aware that the merchandise inventory was moved to Orlando, and that it was Doret Shop's inventory. She did willfully and knowingly, and certainly considering the relationship between her and her ex-husband, maliciously injure the property of another. Therefore, her conduct falls within the framework of the exception to discharge set forth in § 523(a)(6). A separate Final Judgment will be entered in accordance to the foregoing.